# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 4440 | **DATE** | 2/5/2001 |
| **CASE TITLE** | Jimmie Johnson vs. Jewel Food Stores, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 3/1/01 at 9:30 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [38] is denied as to Plaintiff's hostile environment sexual harassment claim and granted as to Plaintiff's retaliation claims. Defendant's motion to strike Plaintiff's responsive materials [48] is denied. A status hearing is set for March 1, 2001 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| ✓ | Notified counsel by telephone. | | FEB 0 8 2001 | | |
| ✓ | Docketing to mail notices. | | date docketed | | 55 |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | |
| RJ | courtroom deputy's initials | OUT OR DOCKETING 01 FEB -7 PM 2: 23 | date mailed notice | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

JIMMIE A. JOHNSON, )
                Plaintiff, )
v. ) Case No. 98 C 4440
                                      )
JEWEL FOOD STORES, INC., ) Judge Joan B. Gottschall
a New York corporation, )
                Defendant. )

**DALETED**

**FEB 08 2001**

## MEMORANDUM OPINION AND ORDER

Plaintiff Jimmie Johnson (Johnson) filed suit against her former employer, Jewel Food Stores,

Inc. (Jewel) alleging that she experienced a sexually-harassing hostile work environment of which

Jewel was aware yet failed to correct; that, in retaliation for opposing the harassment, she received

performance reprimands that prevented her from being promoted; and, finally, that she was fired in

retaliation for filing an EEOC charge relating to the harassment, in violation of Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* Jewel moved for summary judgment on all

claims.

### Factual Background[1]

Jewel, the owner of a chain of grocery stores, hired Johnson in August of 1994 to work as a

---

[1] Citations are to the numbered paragraphs of the parties' Local Rule 56.1 Statements of Material Facts (Pl.'s Facts and Def.'s Facts) and to their proffered exhibits and affidavits. The court heeds Jewel's objections to Johnson's Facts and to the evidence (her statements in her affidavit, complaint letters, and interrogatory responses) in support thereof; however, because the materials in question contain some admissible assertions of fact amidst many legal conclusions, unsupported opinions, and other inadmissible statements, Jewel's Motion to Strike Johnson's responsive materials in the entirety is DENIED. The court notes that the purpose of the Local Rule 56.1 statements is to highlight specific factual evidence, not merely to recite allegations and provide general citations to the record. For example, Johnson claims that supervisor Mike Impola "harassed" her "more than once," but supports the statement by repeating the allegation in her affidavit and citing a letter in which she described one specific instance of alleged harassment by Impola. Such evidence does not support a statement that Impola harassed her "more than once." Though many of Johnson's "fact statements" more closely resemble conclusions and unsubstantiated opinions, the court will consider any concrete evidence submitted in support of her claims.

part-time service clerk at a Jewel store located on North Western Avenue in Chicago. Pl.'s Fact ¶ 1; Def.'s Fact ¶ 1. As a service clerk, Johnson's responsibilities included bagging groceries ("parceling"), preparing deliveries, "retrieving carts from the parking lot, assisting customers, stocking and cleaning shelves, . . . other light maintenance work, such as sweeping and mopping," and helping to maintain the "front end" of the store in addition to performing other duties as assigned by management. Def.'s Fact ¶¶ 3-4; Def.'s Ex. 4, Roberts Aff. ¶ 4. The service clerk job description lists the ability to "follow instructions" as the only job requirement. Def.'s Ex. 4-A. Johnson reported directly to front end supervisors and to the service manager, assistant manager, co-manager and store manager. Def.'s Fact ¶ 5; Def.'s Ex. 4.

The parties agree that Johnson's employment with Jewel was problematic, but dispute the source of her difficulties. According to Johnson, she began to experience "harassment" "within months" after she was hired. Pl.'s Fact ¶ 2. As a result of the discord Johnson encountered with her co-workers and supervisors, she began to record the date and time of her grievances in a running log or diary. See Pl.'s Fact ¶ 5; Pl.'s Ex. 1-A. She also sent numerous complaint letters via certified mail to various Jewel managers, informing them of incidents that she considered to be "harassment" and contesting disciplinary actions that had been taken against her. See, e.g., Pl.'s Exs. 1-C, 1-D, 1-F, 1-G, 1-H, and 1-I. In June of 1996, Johnson filed a charge of racial discrimination with the Illinois Department of Human Rights against Jewel supervisor Janet Johnston. See Pl.'s Ex. 1-B. Johnson withdrew the charge after Jewel agreed to remove six disciplinary write-ups from her record. However, her troubles at work continued, as did her stream of letters alleging "harassment" by her supervisors and co-workers.

Johnson was bagging groceries at 3:58 on February 1, 1997, when Mike Impola, the store's service manager, paged Johnson to the service desk over the intercom. Although customers were lined

up at her checkout stand, Johnson left her post and went to see what Impola needed. Impola asked her if she had to use the bathroom. She said, "No!" and he said, "OK, I thought you might have to use it." Pl.'s Ex. 1-F (also submitted as Def.'s Ex. 11-B); see also Def.'s Ex. 12, Pl.'s Am. Answer to Def.'s First Set of Interrogs., Answer to Interrog. No. 3 (also submitted by Johnson to supplement her affidavit; see Ct.'s 12/1/00 Minute Order granting Pl.'s Mot. to Suppl. Aff., Instanter) (alleging, in contradiction of Johnson's deposition testimony, that Impola stated, "Since you had an early break, I thought you might have to use the bathroom"). Johnson wrote to Andy Harmet, the store manager, to complain about the incident. See Pl.'s Ex. 1-F. Harmet spoke to Impola[2], who denied asking Johnson if she had to go to the bathroom. Impola told Harmet that he had merely asked Johnson if she needed to take a break. Def.'s Ex. 7, Impola Aff. ¶ 6; Def.'s Ex. 11, Harmet Aff. ¶ 7.

On March 10, 1997, at 4 a.m., Johnson discovered that her work locker appeared to have been "tampered with." Def.'s Ex. 12 (Pl.'s Answer to Interrog. No. 3). The same day, a customer named Reynolds called the store to complain about Johnson: Reynolds had asked Johnson twice to use paper bags instead of plastic; she ignored him, and when he approached her to see her name tag, she made an obscene gesture ("gave him the finger"). Johnson had been rude to Reynolds' family on a previous visit to the store. Reynolds told Jewel employee Victor Candiotti, Impola, and assistant store manager Arran West about his complaints and left his phone number. Def.'s Exs. 5-A, 7, 9.

Johnson's personnel file contains statements describing the incident from Candiotti, Impola and West, as well as an unsigned statement from a Randall Sealey indicating that he "did

---

[2] Johnson neither admitted nor denied several of Jewel's proffered Facts regarding its investigation of her complaints, saying that she lacked sufficient knowledge to respond. "An asserted statement of fact requires the opposing party to acknowledge that fact or to cite to other (contradictory) facts in the materials in order to demonstrate a real factual dispute." Ct.'s Standing Order Regarding Mots. for Summ. J. (Gottschall, J., Oct. 14, 1999). The court deems statements without such a response to be admitted, and accepts Harmet's and Impola's statements (as well as the other Facts proffered by Defendant that Johnson neither admitted nor denied) as true.

not see any incident involving Jimmy and a Customer on 3/10/1997 (Monday)." See Def.'s Ex. 5-A. Despite Johnson's claim that she had not been rude to a customer or done anything wrong, Impola and store co-manager Mike Eckardt reprimanded her on March 12 for "rudeness /incivility towards a customer." Def.'s Ex. 5-A. Johnson wrote to Dave Maher, who she believed was Jewel's president, on March 13, reminding him that she had written to him on December 25, 1996[3]

> informing [him] of the harassment in hope of some kind of alternative to control or stop it, but to no avail. I continue to this day Mr. Maher issued written reprimands that are unanimously contrived false stories for some reason; from Asst Store Manager Mike Eckart and Front End Supervisor Mike Impola. Pl.'s Ex. 1-G, p.1 (also submitted as Def.'s Ex. 5-D).

Johnson enclosed the reprimand that Impola had just issued to her and restated her belief, expressed in prior letters, that false and contrived written reprimands prevented her from being promoted. Id. (Jewel policy provides that promotions will be denied to employees who have received a disciplinary write-up within the last six months. Def.'s Fact ¶ 51.) Johnson's March 13 letter set forth a list of questions (for example, asking how she made an obscene gesture if she was supposedly ignoring the customer) regarding her recent reprimand, apparently to show its falsity. Pl.'s Ex. 1-G. Johnson concluded the letter by asking Maher to put "a cease to these matters and acts of harassment permanently." Id. Maher forwarded the letter to Jack Roberts in human resources.

Johnson also wrote to Harmet on March 15th, discussing their March 12th meeting

---

[3] See Pl.'s Ex. 1-D (also submitted as Def.'s Ex. 4-G). Maher forwarded the December 25th letter to Jack Roberts, Jewel's human resources manager for its north region, who had dealt with Johnson regarding her allegations that a delivery person hit her on the back in June of 1996 and other allegations relating to her race discrimination complaint. After Roberts received the December 25th letter, he investigated the allegations therein, interviewed Harmet and Impola, and recorded his findings in a memo dated January 16, 1997. Harmet told him that he had explained to Johnson that the date on the disciplinary write-up she received December 23, 1996, was incorrect. Roberts concluded that he could not substantiate Johnson's harassment claims, and that the disciplinary write-ups about which she complained were warranted. See Def.'s Ex. 4, Roberts Aff. ¶¶ 17-27; Def.'s Ex. 11, Harmet Aff. ¶¶ 5-6.

regarding the customer complaint and complaining that Impola, Eckardt and West were harassing her, particularly by issuing her false reprimands. See Def.'s Ex. 11-D. She claimed that on May 21, 1996, West had "followed behind her" in the store and "started harassing her for no reason." Id. She alleged that West made up "stories" about her so that she would be punished. Id. Harmet had already investigated Impola's "bathroom" comment and Johnson's previous complaints that she had been disciplined unfairly, but proceeded to ask Impola, Eckardt, West, and the other supervisors and employees at the store about Johnson's allegations. Def.'s Ex. 11, Harmet Aff. ¶ 9[4]. He could not confirm Johnson's accusations; he reviewed the allegedly unfair disciplinary write-ups and determined that they were not false.[5] Id. ¶ 11. Harmet found that no one else had complained about West, and there were no witnesses to any inappropriate behavior or touching by West. Id. ¶ 10. Harmet warned West about sexual harassment and reminded him of Jewel's policy against it. Id.

---

[4] In support of her denial that Harmet investigated and interviewed Jewel employees regarding her March 15 complaint, Johnson cites paragraph 56 of her affidavit: "I complained of my first harassment in September 1994, and Jewel did not investigate this incident. Jewel performed its first investigation in September 1997." (She also cites it in other denials that Jewel investigated her complaints.) There is no factual support for her statement in the record; it is too conclusory to contradict Jewel's specific statements about its investigations. Moreover, Johnson's statement that "Jewel performed its first investigation in 1997" is clearly untrue. The evidence in the record, much of it proffered by Johnson, demonstrates that Jewel did conduct investigations of her allegations. For example, Johnson admits that she discussed a June 1996 incident with Roberts, and that Jewel sent security personnel to speak to her about it. See n. 3, supra; Pl.'s Ex. 1, Johnson Aff. ¶ 85, Pl.'s Resp. Def.'s Fact ¶ 149; Def.'s Ex. 3, Johnson Dep. at 297 (admitting Jewel sent "a guy" to meet with her regarding incident). She also admits that she met with Anthony Bowden in response to a letter written to Maher. Def.'s Ex. 3, Johnson Dep. at 298-300. The court cannot accept Johnson's blanket statements that Jewel waited until September of 1997 to investigate her complaints, in light of specific instances in the record that contradict those unsupported statements.

[5] While Johnson disputes the grounds for most of her disciplinary write-ups, she presents no evidence to suggest that the events underlying them "never happened." In Johnson's opinion, even a written customer complaint about her would not be enough to justify a reprimand, because "they could say anything." See Def.'s Ex. 3, Johnson Dep. at 323. A careful review of the entire record reveals that Johnson's claims that she received false reprimands boil down to disagreement with her supervisors' interpretations of events; she merely argues that she was not to blame without pointing to facts that would show that her supervisors made up the events leading to her write-ups. See Def.'s Ex. 5-A.

Roberts looked into the allegations contained in Johnson's March 13th letter to Maher and determined that they lacked merit[6]. See Def.'s Ex. 4, Roberts Aff. ¶ 25. Roberts advised Tom Walters, Jewel's Vice President of Labor Relations, about Johnson's letters. Id. ¶ 27. Walters asked Anthony Bowden, Jewel's Labor Relations manager, to meet with Johnson, respond to her complaint letters, and tell her that any complaints she had about unfair discipline should be handled through the union's grievance procedure. Def.'s Ex. 5, Bowden Aff. ¶¶ 14, 15. Bowden did so, telling Johnson that based on the interviews conducted and statements obtained, none of her harassment allegations could be substantiated. Id.[7] Bowden reported back to Roberts about the meeting. Def.'s Ex. 4, Roberts Aff. ¶¶ 28, 29.

On March 29, 1997, Johnson found one of her two purses (the one "with feminine items in it," not the one containing "important things") sitting out on the floor next to her locker. Def.'s Ex. 3, Johnson Dep. at 123. The next day, she told Harmet that someone had broken into her locker; he advised her to change her lock. See Pl.'s Ex. 1-H at J0018. She alleges that a few days later (on April 2), she received a $5.00 gift certificate as part of an employee appreciation program; Harmet allegedly refused to give her the actual award or to display it. Def.'s Ex. 12 (Pl.'s Answer to Interrog. No. 3). It is unclear whether Johnson is mistaken about the date and is referring to the lone service award in her employee file, dated August 14, 1996. See Def.'s Ex. 8, Halatek Aff. ¶ 20; Def.'s Ex. 8-L.

---

[6] Johnson admits that Roberts so concluded, but disagrees with him. See Pl.'s Resp. Def.'s Fact ¶ 128.

[7] In her affidavit, cited in support of a denial of this fact, Johnson states that "Bowden failed to discuss my complaints of discrimination," but in the next sentence says, "He told me to go [to] the Board." See Pl.'s Ex. 1, Johnson Aff. ¶ 83. The court must conclude that Johnson is admitting that she and Bowden met to talk about her complaints, but that Johnson does not agree with Jewel's characterization of the exchange. Indeed, Johnson admitted in her deposition that Bowden met with her in response to her complaint letters to Maher. See Def.'s Ex. 3 at 298-300. A plaintiff may not survive summary judgment by submitting conclusory statements in an affidavit that contradict prior deposition testimony. See Adusumilli v. City of Chicago, 164 F.3d 353, 360 (7th Cir. 1998).

Johnson wrote to Roberts on April 3 to tell him that she had been "constantly harassed" since their meeting at the Department of Human Rights on October 10, 1996, regarding the racial discrimination charge against supervisor Janet Johnston. See Pl.'s Ex. 1-H at J0015-16 (also submitted as Def.'s Ex. 4-I). She repeated her allegations about the December 23rd reprimand, Impola's bathroom comment and his involvement (along with Mike Eckardt) in the March 12th reprimand, and added that Impola "has done nothing but daily tell me how he has been in my file and how he can make me do what he wants me to do, how he can get me fired, etc." Id. at J0016. In addition, Johnson expressed her opinion that West was somehow behind the mysterious break-ins to her employee locker on March 10 and 29, and that he had directed others to reprimand her on March 24, 1996 and March 12, 1997. Id. at J0017-18. She ended the letter in the hope that Roberts could "expedite some stable solution for this non-sense." Id. at J0018. Based upon Harmet's investigation of similar complaints by Johnson in mid-March, Roberts did not believe that the allegations of this letter merited action. See Roberts Aff. ¶ 31. Johnson denies Roberts' claim that he told her "Jewel had investigated her allegations and they could not be substantiated." Def.'s Ex. 4, Roberts Aff. ¶ 32.[8] The court assumes that Roberts did not tell

---

[8] Johnson cites four statements in her affidavit to support this denial: First, "Jewel maintained a non-responsive attitude for three years before it finally investigated my complaints. No one ever told me of any investigation until September 1997." ¶ 62. This general statement is insufficient to support a denial of Roberts' specific statement; moreover, as discussed above, Johnson has admitted that she was aware that Jewel investigated at least some of her allegations, and that she lacked knowledge as to whether or not they investigated others. See n. 4 and 7, supra; see also Johnson Dep. at 210 (alleging union rep Darlene Swolinski read complaint letters and spoke to Johnson about them); Id. at 290-291 (Johnson did not know if West did or did not respond to her complaint that another employee nearly elbowed her in the breast; she saw him go over and talk to the individual immediately after she complained but does not know what was said and "would not know" if the employee was disciplined). The next two statements relate to events in 1996 and do not contradict Roberts' statement about what he told Johnson in 1997. See ¶¶ 71-72. The last statement in support of Johnson's denial is "Roberts never took any of my calls. He never told me that [my] complaints could not [be] substantiated." ¶ 86. Whether Roberts "took" Johnson's calls or whether he called her, the record reflects that they talked about her complaints on several occasions. See n. 4, supra. Therefore, the court cannot accept this statement as a blanket denial that Roberts spoke to Johnson about her complaints. Johnson's statement that Roberts never told her that her complaints could not be substantiated seems doubtful, given the

Johnson during their conversation that her complaints could not be substantiated.  <u>See</u> Def.'s Ex. 4, Roberts Aff. ¶ 32; Pl.'s Ex. 1, Johnson Aff. ¶ 86.

Johnson found a silver spoon in her locker on April 14 at 4 p.m. and changed her locker the next day.  Def.'s Ex. 12 (Pl.'s Answer to Interrog. No. 3).  Nothing in the record suggests that she experienced any subsequent break-ins.  On April 20, Johnson left a message with Roberts' secretary, Vicki, at 1:20 p.m. inquiring whether Roberts received her certified letter.  She did not receive a response.  Def.'s Ex. 12 (Pl.'s Answer to Interrog. No. 14).

On May 3 and/or 31, 1997, Johnson placed an unsuccessful bid for a part-time bakery clerk position at the store where she worked.  Def.'s Ex. 12 (Pl.'s Answer to Interrog. No. 9); Def.'s Fact ¶ 57; Def.'s Ex. 5, Bowden Aff. ¶ 12; Def.'s Ex. 5-C.  She did not submit the May 31st bid in time to be considered, but was in any event ineligible to receive a new position or promotion because she had received written disciplinary notices in the last six months.  Def.'s Fact ¶¶ 53, 54, 58.

Johnson left a message for Roberts with Vicki at 3 p.m. on June 20, 1997, "regarding Aaron West and Mike Impola."  Def.'s Ex. 12 (Pl.'s Answer to Interrog. No. 14).  She does not indicate whether Roberts responded.

"Yan" (assistant service desk manager Yain Yu) called Johnson to the service desk over the intercom on August 16 at 6:53 p.m., telling her that West wanted her to clean up some spilled milk in the back.  Johnson went to the back of the store, where West said, "Hey Jimmie, I have a present for you."  Johnson turned around and saw a bucket on the floor, which West lifted.  A mouse came running from it.  West "just stood there smiling."  An employee named "Calvert"

---

nature of Johnson's other denials; however, Johnson's statement is not contradicted anywhere in the record except by Roberts' claim to the contrary.  The court must assume for purposes of summary judgment that Roberts did not specifically tell Johnson that her complaints "could not be substantiated."

witnessed this incident. Def.'s Ex. 12 (Pl.'s Answer to Interrog. No. 3); Def.'s Ex. 3, Johnson Dep. at 113-14.

As Johnson was walking through the store at 8:45 p.m. on September 6, 7, or 13[9], 1997, West walked in front of her, reached his hand out, "grabbed" her by the arm and pulled her to him. He pressed against Johnson's "breast" and body so closely that if Johnson would have looked up, their lips/mouths would have touched. Def.'s Ex. 12 (Pl.'s Ans. to Interrog. No. 3); Def.'s Ex. 3, Johnson Dep. at 222-24. On September 20 at 6:10 p.m., front end supervisor Esther (Gomez or Garcia) walked past and "intentionally touched" Johnson's buttocks as Johnson was packing groceries. See Pl.'s Ex. 1, Johnson Aff. ¶ 51; see also Def.'s Ex. 12 (Pl.'s Answer to Interrog. No. 3) (indicating, in contrast to the affidavit, that Esther "grabbed" Johnson's buttocks).

Johnson called Roberts to report these incidents and sent him a certified letter on September 22, 1997, referring to her April letter "regarding harassment." See Pl.'s Ex. 1-I at J0002; Def.'s Ex. 4, Roberts Aff. ¶ 33; Def.'s Ex. 4-J. She now informed Roberts that "the harassment by Aaron West continues. It has escalated to a more aggressive approach." Pl.'s Ex. 1-I at J0002. She recounted that on September 13, West had pressed up against her breast and tried to kiss her and that she had been "pestered by sexual harassment by non-management and management employees. By the desires of the flesh and loose habits they entice others to do the same." Id. at J0002-3. Johnson alleged that front end supervisor "Ester (Last name unknown)" had "harassed" her "on more than several occasions. . . for whatever her reasons or personal gain may be" and that on September 20, Esther had "unmistakably . . .touched" Johnson on her buttocks while she (Johnson) was bagging groceries. Id. at J0003. Johnson felt that Esther knew

---

[9] Johnson testified at her deposition that she did not remember the exact date. See Def.'s Ex. 3 at 223.

she had touched Johnson's buttocks, but Esther did not say excuse me or apologize. Id. Johnson stated that the higher officials to whom she had written were well aware of the harassment, concluding that Roberts' response would be greatly appreciated. Id. at J0004.

Following his receipt of Johnson's newest allegations, Roberts advised Ralph Jewell, Jewel's Loss Prevention Manager, about the complaint and asked Jewell to investigate and report back to him. See Pl.'s Ex. 1-J; Def.'s Ex. 4, Roberts Aff. ¶ 35; Def.'s Ex. 4-K. Jewel's Loss Prevention Department is responsible for and trained in investigating sexual harassment complaints. See Def.'s Ex. 4, Roberts Aff. ¶¶ 14, 15. Jewell ordered Jewel security manager Dee McAndrew to interview Johnson at the store. During the interview on September 26, Johnson described an incident that occurred on September 6 or 7 involving West where he grabbed her and pressed his body up against hers, so that if she had turned her head they would have kissed. See Pl.'s Ex. 1-J. She also told McAndrew that in December of 1996, West had walked up to her (Johnson) at the service desk and "placed his front of body to her right side and arm," pushing against her arm so that if she had turned her hand, "she 'would've been grabbing his genitals.'" Pl.'s Ex. 1-J.[10] Neither Johnson nor West said anything on either occasion. Id. Johnson also related to McAndrew that Esther Garcia (or Gomez) had walked past while Johnson was bagging groceries with her back toward the register. Pl.'s Ex. 1-J. The back of Esther's left hand brushed across Johnson's buttocks. Id. Nothing was said and Esther walked away. Id. McAndrew asked Johnson to make a written statement but Johnson declined because she had already sent Roberts a letter detailing the incidents. Pl.'s Ex. 1-J.; Def.'s Ex. 12 (Pl.'s Answer to Interrog. No. 3). As McAndrew was leaving the store after her interview with Johnson, Johnson saw her speak to a female pan-handler who hung around the outside of the store. Id.

---

[10] Johnson has not included this allegation as part of the instant suit, nor did she refer to it in any of the complaint letters in evidence.

Jewell interviewed West on September 29, 1997. See Pl.'s Ex. 1-J. West denied pressing himself against Johnson on any occasion. In response to Jewell's request, West prepared a written statement stating that on September 7, Johnson nearly ran into him as she was returning to her post at the front of the store. West saw that Johnson was not looking where she was going, so he put his hand on her shoulder to prevent a collision. See Def.'s Ex. 4-K. Jewell then called general manger Andy Harmet into the office, the three men reviewed the statements, and Harmet "admonished" West. Pl.'s Ex. 1-J. McAndrew interviewed Esther on September 30. Esther denied touching or harassing Johnson and prepared a written statement to that effect at McAndrew's request. Id.

The panhandler to whom McAndrew had spoken came in and out of the store on October 1st, walking beside Johnson and twice grabbing her "around the middle like a man would do." Def.'s Ex. 12 (Pl.'s Answer to Interrog. No. 3). The second time, Johnson told the other woman to keep her hands off of her and to stop it. Esther was standing outside the store watching through the window/door and grinning. Id. Johnson told Andy Harmet on October 2 at 10:14 a.m. that if the panhandler bothered her again, Johnson would call the police and have the panhandler locked up. Id. Meanwhile, Jewell conveyed the results of his and McAndrew's inquiries to Roberts, who determined that Johnson's sexual harassment allegations could not be substantiated. Roberts Aff. ¶ 35.

On October 4 at 11:10 a.m., "Sandi" (Sandra Lopez), a checker, and assistant store manager Don Piehl came inside the small work area on register four while Johnson's back was turned putting groceries into a cart. When Johnson turned around, Piehl "was pressed against" her "breast" "where [she] could not move anywhere." Def.'s Ex. 12 (Pl.'s Answer to Interrog. No. 3). Johnson went to see Harmet, asked if he was busy, and walked away after he told her he

was. See Def.'s Ex. 11, Harmet Aff. ¶ 19; Def.'s Ex. 11-G. Ten minutes later, Harmet asked

Johnson what she wanted, and Johnson said, "Oh nothing." Id. Around 11:30, two Chicago

policemen arrived at the store in response to a call from Johnson. Id. According to Harmet,

Johnson wanted to file sexual harassment charges against Piehl, but the police explained to her

that it was a civil matter. Id. Johnson refused Harmet's offer to go to his office and make a

statement. Id.

Harmet contacted Roberts, who asked Harmet to interview witnesses to the incident and

obtain their statements. Def.'s Ex. 11, Harmet Aff. ¶ 15; Def.'s Ex. 4, Roberts Aff. ¶ 37. Piehl

and Lopez prepared written statements for Harmet, which he forwarded to Roberts. Id. ¶¶ 16-18,

21; ¶ 38. Piehl denied touching Johnson and said he was helping her bag groceries. Id. ¶ 17; ¶

37. Lopez reported that Piehl came over to help Johnson, then Johnson disappeared for 45

minutes. Id. ¶ 16; ¶ 37. Based on his interviews, Harmet did not believe Piehl had violated

Jewel's sexual harassment policy. Def.'s Ex. 11, Harmet Aff. ¶ 20. Harmet reported his findings

to Roberts, who once again decided that Johnson's claim could not be substantiated. Id. ¶ 21;

Def.'s Ex. 4, Roberts Aff. ¶ 38. Roberts asked Harmet "to advise Ms. Johnson that Jewel Food

Stores takes these matters seriously" and that Jewel could not substantiate her allegations. Id. ¶

21; ¶ 39. Harmet reported back to Roberts that he had done so. Def.'s Ex. 4, Roberts Aff. ¶ 39.

Harmet did not advise Johnson of the "findings" of his investigation.[11]

---

[11] Johnson denies that Harmet met with her and told her that Jewel took the matter seriously, and
based on its investigation could not substantiate any of her complaints. See Pl.'s Resp. Def.'s Fact ¶ 169.
In support she cites only ¶ 62 of her affidavit, which the court has found to be overly conclusory and
contradicted by other evidence, supra n. 8. In any event, a statement that Jewel was non-responsive
before it investigated and that no one told her of an investigation until September of 1997 cannot be used
to deny that Jewel informed her about results of an investigation after it took place in October of 1997.
The court deems Def.'s Fact ¶ 169 admitted. In light of Johnson's failure to deny (in a manner that
complies with Rule 56 of the Federal Rules of Civil Procedure) that Harmet met with her and told her
that Jewel could not substantiate her complaints, Johnson's seemingly explicit denial of Def.'s Fact ¶ 170
is puzzling. See Pl.'s Ex. 1, Johnson Aff. ¶ 90 ("Harmet never spoke to me about any findings"). The
court accepts Johnson's statement but wonders if she is quibbling with the semantics of Jewel's

Johnson asked union steward Tony Richards on October 10, 1997, at 10:40 a.m., to ask Harmet to give her the service award she had earned. Richards told her he would, but she never received it. See Def.'s Ex. 12 (Pl.'s Answer to Interrog. No. 3). She filed an EEOC charge on October 20, alleging sexual harassment and retaliation for complaining about sexual harassment. See Pl.'s Ex. 1-K.

McAndrew met with Johnson on November 18, 1997, to tell her that Jewel had investigated her sexual harassment complaints but could not substantiate them, and that the investigation would be closed. She added that if Johnson had any further complaints she should advise Jewel immediately. Def.'s Fact ¶ 160.[12]

On December 27, 1997, Jewel suspended Johnson for alleged insubordination. Def.'s Ex. 12 (Pl.'s Answer to Interrog. No. 3). A front end supervisor, Brenda "Hennington" (Henderson), asked Johnson to sign an envelope containing cash from a delivery. Johnson, who did not operate a check-out drawer or have responsibility for cash and who had not handled the delivery envelope, refused to sign it because she did not want to be responsible for money in an envelope that she had not handled. Johnson felt that Henderson knew that she (Johnson) had not handled the envelope and that it was unreasonable for Henderson to ask her to sign it, so Johnson refused to do so. Def.'s Ex. 12 (Pl.'s Answer to Interrog. No. 10) Henderson became angry and called Harmet on the intercom, telling him that she asked Johnson three or four times to complete the delivery envelope and that Johnson refused her direct requests. See Def.'s Ex. 11, Harmet Aff. ¶

---

statement.

[12] According to Roberts, he also met with Johnson on November 18, a fact that Johnson specifically denies. See Def.'s Ex. 4, Roberts Aff. ¶ 36; Pl.'s Ex. 1, Johnson Aff. ¶ 88. Johnson also denies that they told her the investigation would be closed, but cites only her statement denying she met with Roberts and ¶ 62, which the court has found insufficient to deny that Jewel discussed investigations with her after September of 1997. See n. 8 and n. 11, supra.

22. Harmet told Johnson to fill out the envelope; she refused even his request. Id. Harmet contacted Bowden about the situation and suspended Johnson pending an investigation. Id. ¶¶ 22, 23. Harmet obtained statements from witnesses to the incident at Bowden's request. Id. ¶ 23. Bowden (who, in his affidavit, apparently confused Halatek with his replacement, Harmet) reviewed the statements from Henderson, Harmet, and two witnesses, as well as Johnson's personnel file, noting that she had been reprimanded previously for refusing to complete a delivery; Bowden approved her termination. See Def.'s Ex. 5, Bowden Aff. ¶ 21. She was notified of her termination by letter on January 9, 1998. Id. ¶ 23.

Johnson does not dispute that she was the subject of multiple disciplinary actions during her employment at Jewel, though she denies generally that the suspensions and reprimands were warranted. See Pl.'s Resp. to Def.'s Fact ¶¶ 20, 25-33, 35-43, 45-49; Pl.'s Ex. 1, Johnson Aff. ¶ 28. Her personnel file reveals that she was reprimanded for tardiness on September 10 and 19, 1994, November 24, 1994, and November 16, 1996 (verbal warnings); and on January 5, 1997 and November 3 and 10, 1997 (written warnings for excessive tardiness). See Def.'s Fact ¶¶ 25-7, 38, 40, 46, 48. Johnson does not dispute that she deserved the warnings about tardiness or one she received on October 28, 1997, for "no call no show," nor does she deny that on November 7, 1997, she was counseled regarding improper punching procedure and had a notation placed in her file. See Pl.'s Resp. Def.'s Fact ¶¶ 25-7, 38, 40, 46, 48; Def.'s Fact ¶¶ 45, 47. According to Jewel management and employees, Johnson was a poor worker who did not take direction well[13].

Jewel provided Johnson with an employee handbook. Def.'s Facts ¶ 18. She signed an acknowledgment upon its receipt, stating that she understood and would comply with the policy

---

[13] In support of her denial that her "work history is replete with incidents of poor and inadequate job performance," see Def.'s Fact ¶ 19, Johnson cites to her affidavit at ¶ 24: "On November 24, 1996, Mike Impola called me to the service desk, tore up my request and threatened me."

on sexual harassment. However, there is no evidence about what that policy was. Roberts'
affidavit states that Jewel had a sexual harassment policy during Johnson's tenure and attaches a
current copy; Jewel did not furnish the court with a copy of the policy as it existed in 1994 at the
time Johnson received her company handbook, or as it existed during the time in question
(1997). The current policy provides that harassment complaints should be made to an immediate
supervisor and/or the human resources department; there is no evidence that the current policy is
different from the one in force during the relevant time period. See Def.'s Ex. 4, 4-C. The policy
acknowledgment form is more detailed and says victims of harassment can tell a supervisor,
members of management, Human Resources or EEO/Diversity departments, but there is no
record that Johnson saw or signed this form. Id. The acknowledgment form indicates that
members of management or human resources who learn of or observe harassing conduct should
report it to the EEO/Diversity department. Id. In addition, posters outlining procedures for
reporting workplace harassment were posted in the lunchroom of the Jewel store where Johnson
worked. Def.'s Fact ¶ 17.

### Summary Judgment Standard

The Federal Rules of Civil Procedure mandate that motions for summary judgment be
granted if the designated evidence shows "that there is no genuine issue as to any material fact
and that the moving party is entitled to a judgment as a matter of law." See Fed. R. Civ. P. 56(c).
The moving party may meet its burden of demonstrating the absence of a triable issue by
demonstrating "that there is an absence of evidence to support the non-moving party's case."
Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325, 106 S.Ct. 2548, 2552, 2554, 91 L.Ed.2d 265
(1986). The party opposing a well-supported summary judgment motion may not simply rest on
the pleadings, but must respond affirmatively with "specific facts showing that there is a genuine

issue for trial." Fed. R. Civ. P. 56(e). In deciding a motion for summary judgment, courts construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); Shank v. William R. Hague, Inc., 192 F.3d 675, 681 (7th Cir. 1999).

If enough evidence exists for a jury to find for the plaintiff on an issue of material fact, the defendant's motion will be denied; but, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to avoid summary judgment. La Montagne v. American Convenience Products, Inc., 750 F.2d 1405, 1410 (7th Cir. 1984). "Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment." Butler v. Consolidated Rail Corp., 31 F. Supp.2d 1098, 1102 (S.D. Ind. 1998) (citing Anderson, 477 U.S. at 248, 106 S.Ct. at 2505).

While the standard for summary judgment in employment discrimination cases is not a heightened one, the decision must be approached with "added rigor" because credibility and intent are often central issues. Collier v. Budd Co., 66 F.3d 886, 892 (7th Cir. 1995) (quoting Courtney v. Biosound, Inc, 42 F.3d 414, 418 (7th Cir. 1994): "Affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.")

### Continuing Violation Doctrine

In Illinois, a complainant must file an EEOC charge within 300 days of the occurrence of an allegedly discriminatory act before a complaint based upon that act will be considered timely. 42 U.S.C. § 2000e-5(e)(1); see Filipovic v. K & R Express Sys., Inc., 176 F.3d 390, 396 (7th Cir. 1999); Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 445 (7th Cir. 1994). Jewel argues that, because Johnson did not file her EEOC charge until October 20, 1997, all claims based upon acts prior to December 24, 1996, are time-barred. Johnson counters that her case is one in "which the

plaintiff charges the employer with, over a period of time, following a covert practice of discrimination, evidence[d] only by a series of discrete, allegedly discriminatory acts." Pl.'s Mem. Opp. Summ. J. at 9, citing <u>Doe v. Donnelley</u>, 42 F.3d at 445. Arguing in a confusing sequence that her case fits that description, Johnson notes in her brief

> Johnson alleged in her 1997 charge with the EEOC that since her employment in 1994, "I have been continuously subjected to sexual harassment from various management and non-management employees." In her 1998 charge of retaliation, Johnson charged that she filed a charge in October 1997 alleging retaliation and sexual harassment, and that she was discharged on January 9, 1998. Johnson alleged that Jewel's stated reason for terminating her was pretextual for discrimination, in that she complained of sexual harassment by supervisory and non-supervisory staff.
> Pl.'s Mem. Opp. Summ. J. at 9.

Johnson concludes that her pre-1997 claims are not time-barred because she "linked her 1998 claim for retaliation to her 1997 claim for sexual harassment. In her 1997 charge, Johnson alleged that since 1994, she has continuously experienced sexual harassment." <u>Id</u>.

Johnson is correct that the continuing violation doctrine allows a plaintiff to recover based on time-barred acts if those acts are linked to acts that fall within the limitations period, <u>Doe v. Donnelley</u>, 42 F.3d at 445, but she ignores the fact that the purpose of allowing a plaintiff to seek relief under the theory is "to permit the inclusion of acts whose character as discriminatory acts was not apparent at the time they occurred." <u>Id</u>. at 446 (citing <u>Moskowitz v. Trustees of Purdue Univ.</u>, 5 F.3d 279, 282 (7th Cir. 1993)). If an employer's discriminatory practices (e.g., tolerating sexual harassment) are covert, as opposed to open and obvious, then a plaintiff may not be immediately aware that her rights are being violated. It would be unfair to require a plaintiff to file a discrimination charge before she could reasonably recognize what she has been subjected to as discrimination. However, the continuing violation doctrine applies only when "it would have been unreasonable to expect the plaintiff to sue before the statute ran on

that conduct, as in a case in which the conduct could constitute, or be recognized, as actionable harassment only in the light of events that occurred later, within the period of the statute of limitations." <u>Galloway v. Gen. Motors Serv. Parts Operations</u>, 78 F.3d 1164, 1167 (7th Cir. 1993), <u>quoted in</u> <u>Filipovic</u>, <u>supra</u>, at 396.

Despite the plaintiff's ineffectual argument, the court might be inclined to apply the continuing violation doctrine and excuse Johnson's delay in filing sexual harassment charges, because it appears that it could be the type of case in which various unrelated acts of harassment accumulated over time and built upon one another to create a hostile work environment. However, after reviewing the evidence, the court concludes that it is not unreasonable to have expected Johnson to have filed her sexual harassment charge before October 20, 1997. This determination is based upon the unique circumstances of this case: Johnson insists that she began to complain in 1995 about harassment that started in 1994, but did not file a sexual harassment charge with the EEOC until late 1997, although she had filed a racial discrimination charge in 1996. Under Johnson's own theory of her case, she believed that she was being subjected to continuous sexual harassment in various forms[14] beginning in September of 1994, complained verbally to her supervisors on at least nine occasions, wrote at least fifteen certified

---

[14] Johnson believed, although she offers no proof of this, that Jewel gave out her home address without her knowledge or consent, and that as a result, a Jewel security guard made an unwanted social call to her home late at night on September 26, 1994. Def.'s Ex. 12 (Pl.'s Answer to Interrog. No. 3). Johnson also thought a supervisor disclosed her work schedule to an unknown person over the phone and that she was reprimanded in retaliation for reporting this "harassment." <u>See</u> Pl.'s Ex. 1-D. She complained to Jewel that different employees had hit her on the buttocks, hit her in the shoulder, and elbowed (and nearly elbowed) her in the breast. Pl.'s Exs. 1-C, 1-D. A female supervisor looked at Johnson while asking Johnson and another female service clerk to get carts, saying, "You two yews go and get carts." Johnson believes "yew" means "lady of the night." <u>Id</u>. (No dictionary contains this definition and the court admits it is unfamiliar with this usage of the word). Johnson believes that someone used a pen to lock her in the bathroom for seven minutes. Def.'s Ex. 12 (Pl.'s Answer to Interrog. No. 3). A delivery man hit her in the back with the back of his fist. <u>Id</u>. (The man claimed he was only saying hello, but Jewel asked his company to refrain from sending him to the Western store.) Most prominently, Johnson complained about "false" disciplinary write-ups that she received, allegedly in retaliation for reporting the harassment. <u>Id</u>.

complaint letters to management (excluding a group of letters written to her store manager in summer of 1996, detailing her actions each day), and filed an unknown number of union grievances in an attempt to resolve the situation. Although she had been subject to this alleged harassment for nearly two years and had lodged at least six verbal complaints and written at least nine complaint letters by the time she filed an EEOC charge for racial discrimination in June of 1996, Johnson waited another 16 months to file a similar charge alleging sexual harassment.

Assuming without deciding that Johnson has alleged "a long-continued series" or pattern of harassing acts and "not merely a set of discrete events," her case resembles that described by Judge Posner in Galloway, in which "it was evident long before the plaintiff finally sued" that she had a claim for harassment. 78 F.3d at 1167. Statutes of limitations encourage plaintiffs to file claims promptly, "enhancing the likelihood of accurate determinations and removing debilitating uncertainty about legal liabilities." Id. at 1165. The court recognizes that the limitations period for filing a charge of discrimination with the EEOC is "shorter than the usual statute of limitations," and that courts should not interpret statutes of limitations grudgingly. See id. at 1166. Therefore, while Johnson may still sue because the last act of alleged harassment occurred within the statute of limitations, "she cannot reach back and base her suit also on conduct that occurred outside the statute of limitations; for she had no excuse for waiting that long." Id. The court will not allow Johnson to seek relief for acts that occurred before December 24, 1996.[15]

## Sexual Harassment

Title VII prohibits sexual harassment that is "sufficiently severe or pervasive 'to alter the

---

[15] Evidence of alleged harassment and complaints that occurred outside the limitations period may be relevant to show Jewel's liability for harassment within the limitations period if it shows that Jewel had notice of the sexual harassment but did not take reasonable steps to prevent it.

conditions of [the victim's] employment and create an abusive working environment.'" Hostetler v. Quality Dining, Inc., 218 F.3d 798, 806 (7th Cir. 2000) (quoting Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)).  The work environment must be objectively and subjectively perceived as hostile--it must offend "a reasonable person in the plaintiff's position, considering 'all the circumstances'" and it must have actually offended the plaintiff.  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)); Hostetler, 218 F.3d at 807.  To determine whether harassment rises to this level, courts should consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Hostetler, 218 F.3d at 806 (quoting Harris, 510 U.S. at 23, 114 S.Ct. at 371).  Courts must distinguish between "merely unpleasant" versus "hostile or deeply repugnant" working environments:

> On one side [of the line] lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. . . [o]n the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.
> Hostetler, 218 F.3d at 807 (quoting Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430-31

(7th Cir. 1995) (citations omitted)).

In addition, physical sexual harassment may be viewed along a continuum:

> There are some forms of physical contact which, although unwelcome and uncomfortable for the person touched, are relatively minor.  Cumulatively or in conjunction with other harassment, such acts might become sufficiently pervasive as to support a hostile environment claim, but if few and far between they typically will not be severe enough to be actionable in and of themselves.  A hand on the shoulder, a brief hug, or a peck on the cheek lie at this end of the spectrum.  Even more intimate or more crude physical acts--a hand on the thigh, a kiss on the lips, a pinch of the buttocks--may be considered insufficiently abusive to be described as "severe" when they occur in isolation.

. . .

> When the harassment moves beyond the sort of casual contact which (if it were consensual) might be expected between friendly co-workers, and manifests in more intimate, intrusive forms of contact, it becomes increasingly difficult to write the conduct off as a pedestrian annoyance.
> Hostetler, 218 F.3d at 808.

It is important to remember when evaluating a plaintiff's claim of sexual harassment that "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion]. . .because of. . . sex.'" Oncale, 523 U.S. at 80, 118 S.Ct. at 1002 (quoting 42 U.S.C. § 2000e-2(a)(1)). Therefore, a key inquiry is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Id. (quoting Harris, 510 U.S. at 25, 114 S.Ct. at 372 (Ginsburg, J., concurring)).

The extent of an employer's liability for sexual harassment depends upon whether the harassment was committed by a supervisor or a co-worker. Employers are vicariously liable for harassment by supervisors with "immediate (or successively higher) authority over the employee," but may present an affirmative defense if the harassment did not take the form of a "tangible employment action." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998). The affirmative defense requires the employer to prove that it had taken reasonable steps to "prevent and correct promptly any sexually harassing behavior" and that the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id.

Jewel argues that much of the post-December 24, 1996 behavior about which Johnson complains was not based on her sex, and therefore cannot be considered "sexual harassment" under Title VII. Determining which of the many items of alleged harassment can reasonably be viewed as "based on sex" is difficult because Johnson has complained about many different types

of behavior.

It is usually reasonable to infer that a male co-worker or supervisor's physical advances or touching of a female employee are "based on sex" because they involve an "implicit proposal of sexual activity. . . that would not have been made to someone of the same sex." Oncale, 523 U.S. at 80; 118 S.Ct. at 1002. However, harassment motivated by sexual desire is not the only form of sex-based discrimination, and the Court in Oncale noted that an inference of sex-based discrimination could arise if a (heterosexual) female harassed a female victim "in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." Id.

The court disagrees with Jewel's theory that only harassment involving the touching of Johnson's breasts or buttocks could be based upon sex. Two incidents in particular, when viewed in a light most favorable to Johnson's claim, might be seen as sex-related, though not especially severe. The first of these is Impola's bathroom comment on February 1, 1997. Impola's comment may have been designed to embarrass Johnson based on the stereotypical feminine trait of having to use the bathroom more frequently than men. (The fact-finder would determine whether to draw this inference or to conclude, perhaps because he did not say it loudly or laugh at her, that Impola really did think it was time for Johnson's break and had absolutely no intention of humiliating her.) The second incident, involving West and a mouse, might be labeled as a gender-neutral prank when viewed in isolation, but in light West's forcible attempt to kiss Johnson, it could also be seen as based upon a stereotypical view that women are weak and easily upset by small things like mice. The removal from Johnson's locker of a purse containing feminine hygiene products might have been sex-related if designed to draw attention to Johnson's femininity in a male-dominated workplace, but there is no evidence that the

perpetrator or anyone else was aware of what the purse contained. In addition, Johnson offers no evidence about who had access to her locker or how that person(s) conducted the break-in.

It is conceivable that evidence could reveal a workplace so permeated by hostility towards women that it would be reasonable to infer that acts that seem "neutral" when viewed in isolation (or at least not inherently sex-based), were actually motivated by discrimination. However, there is no evidence in this case that could create an inference that the March 12 reprimand, alleged locker tampering, service award, panhandler or other incidents about which Johnson complains were in any way sex-related. As for Esther's touching Johnson on the buttocks, there is no evidence that it was related to sexual desire or any animosity toward women in the workplace.

That leaves two relatively minor incidents (Impola's bathroom comment and West's mouse prank) and two more serious ones involving physical contact by West and Piehl. Here, the non-physical harassment (asking Johnson if she had to use the bathroom and showing her a mouse) was not overtly hostile, gross, or intimidating; it was the type of harassment that courts hold "merely unpleasant" or mildly annoying. See Baskerville, supra, 50 F.3d at 431. The two alleged acts of physical harassment at issue in Johnson's case are more difficult to analyze because Johnson's descriptions of what happened are colored by her subjective beliefs. The difficult task is to determine whether the facts before the court justify an inference that these incidents created an objectively hostile environment.

The alleged harassment involving Piehl, in particular, seems ambiguous because it is undisputed that Piehl and Johnson were standing in close quarters and that Johnson turned around to face him, that Piehl did nothing during the incident or at any other time that would suggest he intentionally pressed against Johnson, and that she has no other complaints about him. The court does not know how long the contact lasted or have any other information except that

23

Piehl's body pressed against her "breast" to explain why Johnson felt offended by the contact. A reasonable person would be less offended by being pressed against in a space where it is appropriate to stand close to others (for example, in an elevator, bus, train or confined work area) because it is more likely to have been an accident; if the touching was sustained or happened again, it would be more reasonable to be offended. Moreover, the contact occurred in public at the grocery store, directly in front of a female checker and presumably the customer whose groceries were being bagged. If this incident were the only one at issue, it would be difficult to find that Johnson's work conditions had been altered by it without some additional evidence to indicate that Piehl's actions were objectively intimidating or hostile.

However, Johnson alleges that another supervisor, West, grabbed her by the arm and pressed up against her breast, holding her so closely that if she would have looked up, their lips would have touched. A reasonable fact-finder could agree with Johnson that West must have been trying to kiss her because he grabbed her and pulled her to him. West's attempted kiss is more forcible than the alleged contact by Piehl, though the court finds West's behavior distinguishable from the situation in Hostetler, in which the plaintiff's co-worker grabbed her face and forcibly "stuck his tongue down her throat." 218 F.3d at 801. In this case, the contact occurred in the middle of a grocery store, not alone in an office as in Hostetler, and West did not actually kiss Johnson; he never touched her face or mouth.

It is unclear if the incident with West, standing alone, is severe enough to have created a hostile work environment for Title VII purposes. However, even if acts of alleged harassment would be insufficiently severe to support a hostile environment claim when assessed individually, the court does not consider a plaintiff's allegations in isolation--all of the alleged incidents must be considered "cumulatively in order to obtain a realistic view of the work

environment." Doe, supra, 42 F.3d at 444. In Hostetler, the court determined that a fact issue existed as to whether a forcible tongue kiss, a lewd remark by the kisser, and another attempted kiss that ended with him unfastening several hooks on her bra and threatening to "undo it all the way," could be considered severe and pervasive enough to create a hostile work environment. 218 F.3d at 809. The court emphasized the "intimate nature" of the "unwelcome, forcible physical contact" to which Hostetler was subjected. Id. at 807.

Johnson was subject to Impola's potentially offensive question about having to use the bathroom, Piehl's pressing against her breast, and West's mouse prank and forcible attempt to kiss her. The issue is whether these acts were severe enough taken together to alter the terms of Johnson's employment within the meaning of Title VII[16]. While this appears to be a borderline case, the question of inferences to be drawn from the facts surrounding the two incidents of physical contact should be resolved in the plaintiff's favor at the summary judgment stage. The determination of whether an objectively reasonable person in Johnson's position would have felt harassed hinges upon findings of Johnson's credibility, the intent of Piehl and West, and other subtle nuances that must be left to a jury. Viewing Johnson's allegations in the totality of the circumstances and drawing reasonable inferences in her favor, the court cannot say as a matter of law that the behavior to which she was subject during the relevant period did not rise to the level of a hostile work environment or was not severe and pervasive enough to have affected her terms and conditions of employment in a way that violated Title VII. Therefore, Jewel's motion for summary judgment on Johnson's claim for hostile environment sexual harassment is denied.[17]

---

[16] The court assumes based on Johnson's reactions of reporting the behavior to her supervisors, and, in the case of the Piehl incident, calling the police, that she found the behavior hostile.

[17] Based on the evidence before it, the court finds that fact issues exist as to whether Jewel took reasonable steps to prevent harassment and Johnson unreasonably failed to take advantage of the procedures in place to combat harassment or otherwise avoid harm. The court has no evidence of what

Retaliation

Title VII protects not only those who are discriminated against, but also those who contest illegal discrimination by filing formal complaints or otherwise challenging objectionable practices. <u>See</u> 42 U.S.C. § 2000e-3(a); <u>Pafford v. Herman</u>, 148 F.3d 658, 665 (7th Cir. 1998).

> We consider [retaliation claims] separately because under Title VII it is unlawful to retaliate against an employee even if the employee's complaints of . . . discrimination (giving rise to the retaliation) are unfounded. The complaints themselves are protected speech under Title VII's terms, meaning an employee may complain (in good faith) without the added burden of having to be right.

<u>Sweeney v. West</u>, 149 F.3d 550, 554 (7th Cir. 1998). A claim for retaliation is distinct from a discrimination claim, but the same analysis applies to both. <u>See</u> <u>Sanchez v. Henderson</u>, 188 F.3d 740, 745-46 (7th Cir. 1999). If there exists "enough evidence for a reasonable jury to conclude that the plaintiff's . . . protected activity prompted the [adverse employment decision] then the case is suited for trial, not summary judgment." <u>Sweeney</u>, 149 F.3d at 554.

As with discrimination claims, a plaintiff can present direct and/or circumstantial evidence to prove that her employer's action was motivated by retaliation, or she can rely upon the <u>McDonnell-Douglas</u> burden shifting framework. To establish a prima facie case of retaliation, a plaintiff must show she engaged in protected behavior and suffered a materially adverse employment action on account of the behavior. <u>Pafford</u>, 148 F.3d at 670. The defendant must then come forth with a legitimate, non-retaliatory explanation, which in turn must be shown to be pretextual if the claim is to survive summary judgment. <u>Id</u>.

Johnson's retaliation claim is limited to retaliation based on her complaints about sexual harassment. <u>See</u> Ct.'s 6/27/00 Op. (finding retaliation claim arising from complaints of racial

---

Jewel's sexual harassment policy entailed in 1997, and the undisputed evidence shows that Johnson often complained about alleged harassment.

harassment outside scope of EEOC charge). The court's task in distinguishing between complaints of racial versus sexual harassment is difficult, given that Johnson's complaints about mistreatment did not allege a basis for the "harassment" until September of 1997. In fact, many of Johnson's complaint letters specifically stated that Johnson did not know why she was treated so unfairly and did not contain information that made it clear that the alleged "harassment" was sex-based. See, e.g., Pl.'s Ex. 1-G at p. 1, supra at p. 4; Pl.'s Ex. 1-H at J0016 (Mike Impola constantly harasses me; clearly, for no explainable reason"; "I am harassed by Aaron West for no reason at all" and "no matter what, for no reason"). As a result, Johnson would have a difficult time showing that she engaged in the protected expression at issue rather than complaining about racial harassment.[18] It is not clear that she can satisfy the first prong of a prima facie retaliation case.

The court will assume that written reprimands constitute an adverse employment action in this case because it is undisputed that Jewel policy denied promotion to employees who had received a write-up within the last six months. See Sweeney, supra, 149 F.3d at 556 (holding that reprimands are not adverse employment actions "absent some tangible job consequence accompanying those reprimands"). Assuming that Johnson can also show that she engaged in protected expression, she has demonstrated no causal link between her complaints about "harassment" and any adverse employment action.

In her first EEOC charge, Johnson alleged that she had been retaliated against in the form of false write-ups and generation of false customer complaints for complaining about harassment. Although Johnson's accusations were so frequent and all-encompassing that it would be difficult to tell if she had been retaliated against for any of her missives containing a recognizable

---

[18] A racial harassment complaint is protected by Title VII, but Johnson did not include a claim of retaliation based on complaints of racial harassment in her EEOC charge.

objection to sex-based harassment, a careful review of the record does not reveal the existence of any causal nexus to link Johnson's complaints with the allegedly false reprimands or other disciplinary action to which she was subject. Johnson points to no instances where a supervisor referred to one of her complaints around the time he reprimanded her. Moreover, even if Johnson could establish a prima facie case of retaliation regarding the reprimands, Jewel has put forth legitimate business justifications for disciplining Johnson. Johnson has failed to present any evidence that the bases for her reprimands, i.e., tardiness, insubordination, customer complaints, etc., were a pretext for retaliation. Johnson believes that these reprimands were "false" and unwarranted; however, she presents no evidence other than her own unsubstantiated opinion that the events underlying the reprimands did not happen or, more importantly, that her supervisors believed the write-ups lacked foundation.

Johnson's statements that she was a "very, very hard worker" (Pl.'s Fact ¶ 2), that she "never refused to conduct a delivery" (Pl.'s Ex. 1, Johnson Aff. ¶ 74), and that she was never rude to any Jewel customer or to her co-workers (Id. ¶¶ 65-6; 73-4) are belied by the record in her personnel file replete with myriad complaints about her from her co-workers and the public. Aside from Johnson's conclusory statements, there is nothing to indicate that all of these incidents were concocted simply to get back at her, and there is nothing to indicate that the people who decided to discipline her in relation to these alleged complaints had any reason to disbelieve the accounts of Johnson's co-workers and the complaints from customers themselves.

The court addresses the reprimand Johnson received on March 12, 1997, because it falls within the 300 day period preceding her EEOC charge. A customer (Reynolds) complained to three different supervisors that Johnson had ignored his requests to use paper bags and then made an obscene gesture at him. Johnson had only her word and a co-worker's statement that he didn't

see anything to contradict the customer. Even if it were true that Johnson was a model employee and was not rude to the customer, Jewel was entitled to choose to believe a customer's word over hers. Taking Johnson's account as true, she has shown only that Jewel's belief of Reynolds was wrong or mistaken, not that 1) Jewel lied about believing Reynolds, using the incident as a cover for retaliation, or 2) Jewel had no conceivable basis to believe him. Johnson thus cannot show that her March 12, 1997 reprimand was in retaliation for any complaint about sexual harassment.

Johnson claims Jewel fired her in retaliation for her opposition to sexual harassment in the form of her EEOC charge. The court notes that there is no evidence that Bowden, Harmet, or Henderson (the individuals involved in the decision to terminate Johnson) knew about her EEOC charge, or were the subjects of her allegations, so it would be difficult to find that their decision was intended to punish Johnson for filing it. The EEOC charge was filed on October 20, 1997 and Johnson was fired January 9, 1998. Pl.'s Fact ¶ 79, 80. Although the events occurred somewhat near each other in time, Johnson fails to establish any other connection between them. Her termination was hardly close "on the heels" of her complaint. See Adusumilli, supra, 164 F.3d 353, 363 (quoting Dey v. Colt Constr. & Devel. Co., 28 F.3d 1456, 1458 (7th Cir. 1994)).

Assuming that the two month time period were brief enough to raise an inference of causation would not help Johnson, for Jewel has provided a business-neutral explanation for its actions. According to Harmet, the store manager, he suspended Johnson for insubordination when she refused to follow a direct order to complete a delivery slip. (Johnson's personnel file reflects that she had been disciplined in October of 1995 and March of 1996 for a similar offense.) Bowden, Jewel's Labor Relations vice president, reviewed the documentation of the events in question and, especially in light of Johnson's past performance deficiencies, determined that termination would be appropriate.

Johnson attempts to refute Jewel's proffered justification by including the following statements in her affidavit: ¶ 65 "I never threatened a supervisor, was incivil, or engage [sic] in misconduct"; ¶ 66 "I always paid attention to performing my job duties, and I never failed to cooperate. I was never insubordinate"; ¶ 74 "I was never discourteous to customers. I never refused to conduct a delivery." However, these generalizations are contradicted by Johnson's answer to Jewel's interrogatory number 10, in which she admitted regarding her termination that "Hennington" (Henderson) asked her to sign a delivery slip but that she refused because she felt Henderson's request was unreasonable. See Def.'s Ex. 12. Johnson offers nothing from which to infer that Henderson did not tell Harmet that Johnson had refused to fill out the form, or that Johnson did not refuse Harmet's order to fill out the form. An employer is entitled to find insubordination when an employee refuses to follow direct orders from her supervisors that are not plainly unreasonable. Whether the request to fill out the form was reasonable or not, Johnson offers no evidence that Jewel set up a "catch-22" situation with the envelope so that it would have an excuse to fire her. There is nothing to show that Jewel did not really base its decision to terminate her (from a position where the only requirement is to follow instructions) upon its perception that she was insubordinate. Absent such evidence of pretext, Johnson cannot prevail on her claim that she was fired in retaliation for complaining about sexual harassment and/or filing an EEOC charge.

Given the utter lack of a connection between Johnson's opposition to unlawful employment practices and the allegedly false reprimands/her termination, no reasonable jury could find that Jewel retaliated against her in violation of Title VII[19]. Therefore, the court finds

---

[19] Johnson does not appear to argue that she suffered an adverse employment action because of her sex. Her EEOC charge is unclear as to whether the failure to promote was retaliatory only or both retaliatory and discriminatory; her brief in opposition to summary judgment does not discuss what used to be known as "quid pro quo harassment" except to distinguish her claim from it. See Pl.'s Mem. Opp.

that Jewel's motion for summary judgment should be granted as to Johnson's retaliation claim.

## Conclusion

For the foregoing reasons, Defendant Jewel's Motion for Summary Judgment is denied at to Plaintiff Johnson's claims of hostile environment sexual harassment, and granted as to Johnson's claims of retaliation.

ENTER:

_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:   February 5, 2001

---

Summ. J. The only suggestion of such a claim occurs near the conclusion of her brief (". . . she was subject to. . .adverse employment decisions based upon her sex and protest of the harassing acts" p. 13). Jewel addressed only the hostile environment sexual harassment and retaliation claims. Any claim that Johnson suffered an adverse employment action because of her sex would fail for the same reason that a retaliation claim based on her complaints about harassment would fail: there is nothing in the record to suggest that the reason Jewel gave for her termination or reprimands (i.e., insubordination and a record of poor performance) was a pretext or lie.